Lloyd Stevenson BOND,
Petitioner-Appellant,

v.

STATE OF OKLAHOMA,
Respondent-Appellee.

No. 75-1321.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 27, 1976.

Decided Dec. 20, 1976.

Joseph L. Hull, III, Tulsa, Okl., for petitioner-appellant.

Kay Karen Kennedy, Asst. Atty. Gen., Oklahoma City, Okl. (Larry Derryberry, Atty. Gen. of Oklahoma, Oklahoma City, Okl., on the brief), for respondent-appellee.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

Petitioner Bond appeals from the denial of relief in a habeas proceeding challenging an Oklahoma conviction for kidnapping under 21 O.S.A. § 741.[1]

The essential facts are that Bond, his co-defendant Jenkins (not a party herein) and one Michael Wyatt were involved in an apparent attempted burglary of a combination apartment and office building in Collinsville, Oklahoma. The kidnapping charge against Jenkins and Bond arose from the alleged confinement of Mrs. Bess Keith during the incident. See § 741(1), n. 1. The three men fled after a shooting occurred nearby and they were stopped shortly at a roadblock in Tulsa, where Wyatt was shot and killed. Jenkins and Bond were jointly tried and convicted on the kidnapping charge.

Bond received a 15-year sentence under the Oklahoma recidivist law, 21 O.S.A. § 51(1), a prior conviction for uttering a forged instrument being proved. The judgment and sentence were affirmed on direct appeal. *Jenkins et al. v. State of Oklahoma*, 508 P.2d 660 (Okl.Cr.).

This federal habeas proceeding was prosecuted in the Northern District of Oklahoma. Bond asserted grounds as set out in a brief attached to his habeas petition, which were essentially that: (1) he was improperly tried and convicted for kidnapping as it was so concurrent and incidental to other acts of the defendant as to constitute an unnatural elevation of the true crime to be charged; (2) the State court erred in refusing to exclude an admission by co-defendant Jenkins as against Bond, said admission or confession having been made outside the presence of Bond, citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, and thus arguing denial of the right of confrontation; (3) the court erred in overruling Bond's motion for a severance; and (4) the court erred in allowing prejudicial statements by the prosecutor and admission of evidence of violence, immaterial and unrelated to the elements of the crime charged.

The district court reviewed the transcripts of the State court criminal proceedings. It found that there were no material issues of unresolved facts and that a hearing was not required. The court rendered its decision by an opinion and order denying relief and dismissing the action.

In this opinion the district court agreed that admission of the confession of co-defendant Jenkins was constitutional error in violation of the confrontation clause, citing *Bruton*, and said that this error had given

---

1. The Oklahoma kidnapping statute provides:

§ 741. Kidnapping defined

Every person who, without lawful authority, forcibly seizes and confines another, or inveigles or kidnaps another, with intent, either:

First. To cause such person to be secretly confined or imprisoned in this State against his will; or,

Second. To cause such other person to be sent out of this State against his will; or,

Third. To cause such person to be sold as a slave, or in any way held to service against his will, is punishable by imprisonment in the penitentiary not exceeding ten years. Upon any trial for a violation of this section, the consent thereto of the person kidnapped or confined, shall not be a defense, unless it appears satisfactorily to the jury, that such person was above the age of twelve years, and that such consent was not extorted by threat, or by duress. R.L.1910, § 2374.

the court a great deal of concern. However, it was concluded that the error was harmless beyond a reasonable doubt under *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340, so that the conviction need not be held invalid. This and all other grounds for challenging the conviction were rejected.

On appeal the same four issues presented to the district court are argued, along with one additional point. We will discuss all these primary appellate contentions.

*First*, we consider the confrontation issue and the claim that the admission of co-defendant Jenkins's confession violated the Sixth Amendment confrontation rights of Bond, the most serious problem in the case.

■ The right of such cross-examination as an element of confrontation and due process has been clear for some time. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923. Furthermore the attempt to protect against proof of a confession of one not subject to cross-examination by a limiting instruction has not been con-

stitutionally permissible since *Bruton* was decided. Such a procedure was followed in this trial, well after *Bruton*, but it was clearly constitutional error and the State does not contend otherwise.[2]

The State argues, however, that properly admitted proof of guilt was so overwhelming, and the prejudicial effect of the confession of codefendant Jenkins was so insignificant by comparison, that it is clear beyond a reasonable doubt that improper use of the confession was harmless error, citing *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340. Bond vigorously argues that the error was not harmless beyond a reasonable doubt under the strict standard of *Chapman v. California,*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. These conflicting contentions require careful examination of the trial transcript, which we have considered.

### The prosecution's evidence

There was substantial evidence for the prosecution tending to show the following:

> [Bond's counsel]: *With all due respect to the Court, an admonition will not relieve this.*
> THE COURT: That will be for somebody else to determine. I'm going to do what I can with it.
> (Proceedings resume within hearing of the jury)
> THE COURT: All right, in view of the objection here, ladies and gentlemen of the jury, I was going to do this when this testimony was over, but I'll do it now. Any statement that the defendant Bond made to this officer or anybody else for that matter, would be _ _ _ the officers testimony shouldn't be considered by the jury as against the other defendant, because it's hearsay testimony. *Any statement made to this officer by the defendant Jenkins as to the defendant Bond would also be hearsay testimony, because it was made out of the presence of each of the defendants. The jury will have to be very careful not to consider the testimony of one of these defendants as opposed to the other, for that reason. As far as I can see you have a situation here with two persons involved and there is no other way to do it. That makes it a little difficult on the jury, but please try to do that if you can.*
> (Emphasis added).

---

**2.** The brevity of the hearsay objection made to the trial judge, and the apparent failure to cite to the court the *Bruton* case, may well explain the occurrence of the error. Nevertheless we feel the objection as made was sufficient to raise the issue in the State court and no claim of lack of exhaustion of state remedies on this issue is made by the State.

The limiting instruction recognized the difficulty and attempted to solve the problem. The objection and the limiting instruction occurred during the testimony of Officer Johnson a Detective Sergeant with the Tulsa Police Department (Record, Volume V—hereafter R.V, 248–250):

> [Bond's counsel]: I would request that this testimony cease and an evidentiary hearing be held at this time to determine the voluntariness or any waiver of any of the defendant Jenkins's rights, outside the presence of the jury.
> THE COURT: I am going to deny it on the basis as far as I can see it is made at this time for the purpose of delay rather than any good that could be accomplished.
> [Bond's counsel]: It totally removes whatever is left of the chance for a fair and impartial trial in this case. *If this testimony is obiter hearsay as to my defendant Bond*
> ‐ ‐ ‐
> THE COURT: I will take care of that, or try to.

On January 2, 1972, a Sunday, Mrs. Bess Keith was living in a second story apartment of a building in Collinsville, Oklahoma. Collinsville is a community of some 3,000 persons located just north of Tulsa.[3] The downstairs of the building contained a drug store and the offices of a dentist and two doctors. Upstairs the building was partly vacant. Mrs. Keith was in her apartment that morning at about 11:30 and her son, James, was visiting her.

Mrs. Keith testified that she heard noise for 15 or 20 minutes from an empty apartment in the north part of the building. She walked up and pushed the door open and went in. This was between 11:30 and 12:00. She walked in and saw two boys under a lavatory. This was in a kitchen of the two room apartment, the other room being a combination bedroom and living room (R.V, 133, 158).

When she walked around the lavatory and saw the two boys, she said "[w]hat's going on here?" The boys had some kind of tools and they were down pulling up the floor boards. After her comment, someone came from behind the door she had pushed open, stuck a gun in her arm and said to "get your hands up and shut your mouth." She said the fellow had a pistol, he shoved her over to two chairs sitting there in the living room, which was quite large, and told her to sit down and get her head down (R.V, 133–35).

The fellow who had set her down in the chair asked who else was in her apartment and she told him her son, James Keith, was there. He went to look for the son but returned and said he wasn't there. He then left the apartment again and was gone four or five minutes. One of the other boys then stood over her with a gun and the other boy was down under the lavatory working, pulling up boards (R.V, 138–39).

The individual who had left never came back and the two boys in the apartment

came to her, took hold of her arms and said "we'll have to tie you up . . ." (R.V, 140). At the trial Mrs. Keith was asked if she could identify any of the persons that were in the apartment on January 2. She said "I think so" and after an objection, remarked that she had identified them once. She said that after four months they looked a little different. After the court said that she still had not identified anyone, and after being asked by counsel to point them out, she said: "Well, those two right over there." (R.V, 142–43).

Mrs. Keith described clothing being worn by two individuals in court. The court declined a request that the record should reflect that she had identified defendants Bond and Jenkins. Counsel objected to such a statement in the record. He said that any such notation should be stricken unless the record showed that she had not said she was sure; he argued further that she appeared unsure and had incorrectly described the color of one shirt (R.V, 143–44). The court said that in closing arguments counsel could explain their positions "[b]ut that's a question for the jury to decide." Mrs. Keith remarked that she had not said she was not sure and further testified that there was not any question in her mind but that these individuals were the ones in the apartment that day (id. at 144). On cross-examination she testified she saw the faces of the men under the lavatory and they were the two defendants. She said both of them tied up her feet (R.V, 167).

Mrs. Keith testified that the two individuals "[t]ore up the floor and tied me up." After testimony by her indicating the position in court of the defendant who held a gun on her after the other man left, and after an objection by Bond's counsel to the prosecuting attorney pointing at either defendant, Mrs. Keith remarked: "I can't see too good." (R.V, 145–46).[4] She then testified that they took her and told her to lie

---

3. According to Bureau of Census figures for 1970 the population of Collinsville was 3,009.

4. In the preliminary hearing transcript in our record it was shown that Mrs. Keith wore glasses. She testified at that hearing that she had them on when she walked in the apartment and saw all three men with her glasses on, before they were "jerked" off of her, thrown on the floor and broken (R.III, 75–76).

down on the bed and tied her legs, told her to turn over and they tied her arms. They had her arms behind her tying her when she heard a shot (R.V, 146–47). She was asked whether she was with anyone at that time and said: "No, the boys were tying my hands, these two boys." (id. at 148).

Mrs. Keith identified two pieces of cord taken off of a venetian blind which were used to tie her up. While they were tying her up, the third boy was gone. The window shades in the room were shut. She said she was in the room being tied up for about five minutes. They were just tying her hands when the shot went off, she screamed and they ran out the door and left it open. She thought they had about two loops around her hands and they pulled loose (R.V, 151–52).

Mrs. Keith testified that anyone coming up the stairs could not have seen her on the bed, but could have heard her (R.V, 173–74). She laid there because her legs were tied and she couldn't get off the bed. Two ladies came up and untied her. All together she had laid in the room maybe 10 or 12 or maybe 15 minutes; further, she said that when she was seated earlier she had her head down for around 20 minutes. After she was untied, she went back to her apartment, saw that her son was shot, and sent him to the hospital (id. at 151; 153–54; 166–69).

Mrs. Keith testified further that she had lived in the building about 33 years and people knew it as her residence. The building was in the middle of Collinsville on one of the busiest corners. On a Sunday morning there would be many people passing to and from a church right near the building. In the building there was a rest room on the second floor used by people from the doctors' office and sometimes by school children coming in.

A Collinsville Police Officer, Mr. Stanford, testified that he was on duty the morning of January 2, 1972, and investigated this incident at the building. He made a broadcast at about 11:45 or 11:50 to his dispatcher that Jimmy Keith had been shot and three young white males had fled east out of Collinsville in a blue Karmann Ghia. He had no license number.

About a minute after the broadcast he went upstairs. Mrs. Keith had been untied and said she would rather not discuss the matter right then. She was rubbing her ankles and said the rope on her ankles was very tight. There in a kitchen was a lavatory and a closet in one corner and beneath that was a large hole in the floor, with a chopping axe, a sledge hammer and a large screw driver lying next to the hole. The Hallen Drug Store was directly beneath that room (R.V, 181). In a bedroom of the apartment the officer found two sections of cord on the bed which appeared to have been cut from venetian blinds, and these were identified as an exhibit (id. at 182).

On returning to his patrol car Mr. Stanford proceeded south, attempting to locate the Karmann Ghia, but he was notified the Highway Patrol was pursuing such a vehicle, and turned back. This was about 10 minutes after he had put out his call on the car (id. at 184).

Officer Haynie of the Oklahoma Highway Patrol testified that he heard from the dispatcher about a shooting in Collinsville. While he was headed north, he spotted a dark blue Karmann Ghia headed south with two white male occupants. He turned around and reported he was following the vehicle and he then saw a third occupant appear out of the backseat, making three white male occupants in the car. He followed the car for some seven to eight miles. He was joined by another patrol car and a roadblock was set up ahead of them by the Tulsa Police Department (id. at 188–190, 202).

When it neared the roadblock, Officer Haynie said the westbound Karmann Ghia first slowed down and then speeded up and swerved at an officer standing in the road. This officer made motions to stop and had his weapon drawn, and the car continued west. The police officer started shooting and the car careened off to the right side of the road, out of control, and hit a fence (id. at 191). In court, Officer Haynie identified Bond as the occupant from the right front

seat of the car and defendant Jenkins as the passenger in the rear seat (id. at 195). In the car he found a .38 Smith & Wesson revolver underneath the right front seat.

The Tulsa Police officer who was at the roadblock, Dale Bradley, also testified. He said it was only a few seconds after he set up the roadblock that the car came around the curve, followed by two Highway Patrol units. Bradley's vehicle was sitting in the south or eastbound lane, and he stood in the westbound lane, put his hand up and drew his revolver. This was at 11:55. The car was coming at a pretty fast rate, 50 or 60 miles an hour (R.V, 207, 210). The car seemed to slow for a second, and then accelerated and came at Bradley.

When the car got about to him he jumped aside, fired at the left rear tire three times, and then fired at the engine three times and one of these shots went through the back rear glass. The car ran off the road and made a big turn. In court, Bradley identified Bond as the right front passenger and Jenkins as the rear seat passenger. When they got out, one of them said they had shot his Buddy or friend (id. at 209–210).

A Tulsa investigating police officer, Detective Sgt. Johnson, testified about separate statements made to him at the Tulsa County Courthouse by Bond and Jenkins on the afternoon of their apprehension. The statements were made starting about 2:15 or 2:30 (R.V, 239, 253). Bond's statement, as related by Johnson, was as follows (id. at 244–45):

A. Mr. Bond stated that he, along with the defendant Jenkins and Michael Wyatt, had been together since the evening prior on the 1st of January, 1972. They had been consuming a considerable quantity of alcoholic beverages. He stated that he personally had consumed approximately a quart of whiskey during this time. He stated that he had become so intoxicated that during this time he could not remember exactly everything which he had done. He did state that he remembered being with Wyatt and with Jenkins in the town of Collinsville, Okla-homa. He stated the next thing that came to his memory was the fact that someone said that the Highway Patrol was chasing them and that shortly thereafter their car went out of control and crashed through a fence. He stated he then was removed from the automobile by a police officer and was placed under arrest.

Officer Johnson said he did not recall smelling the odor of alcohol on Bond.

The prosecution evidence discussed to this point includes the material proof admitted, exclusive of the confession of Bond's co-defendant Jenkins. We must consider the foregoing proof and then focus on the improperly admitted confession of Jenkins to determine whether its admission renders the conviction invalid or may be held harmless error, beyond a reasonable doubt.

*The inadmissible confession of co-defendant Jenkins*

Detective Sgt. Johnson was also permitted, over objection, to relate a confession by Jenkins. This was given to Johnson, after Bond's statement, the same afternoon the defendants were arrested. Johnson said that he advised Jenkins of his rights and that Jenkins said he would make an oral statement. This statement, as related by Johnson from memory, was essentially as follows (R.V, 245–252):

Jenkins said that he, Bond and Wyatt had been together a number of hours before the Collinsville incident. They drove there in a blue Karmann Ghia owned by Wyatt. They saw what appeared to be an empty apartment over a drug store and intended to go in the apartment and tunnel down into the drug store and steal narcotics. They went in and started tunneling through the floor (R.V, 247).

After a few minutes a white female in her late fifties or sixties suddenly appeared at the door and asked what they were doing. Jenkins said they pulled guns on her, forced her to sit down and remain in a chair, and continued their tunneling for a few minutes. Later she was forced into an adjoining room and was tied up on a bed.

Something came up that forced them to leave (id. at 248, 250).

Johnson testified further that Jenkins said they ran down to the car and started driving toward Tulsa. He said Wyatt was driving, Bond was riding in the right front seat, and he, Jenkins, was in the back. Wyatt said they were being pursued by Highway Patrol cars. They turned and a roadblock was observed. Wyatt attempted to go through, several shots were fired, and Wyatt was struck in the head. This caused the car to go out of control and to crash into the fence (id. at 250–51).

Johnson asked Jenkins about tying up Mrs. Keith and Jenkins said they had tied her feet first and left her in the room. He said "he didn't want her to follow them." (id. at 251).

■ In closing argument by the prosecution the facts were generally summarized. Some emphasis was placed on the confession of Jenkins as to what the three men had done and on the statement that they bound Mrs. Keith to keep her from following them as showing the intent to confine her, required by the Oklahoma statute. The confession was re-emphasized during the prosecution's closing argument as showing that the men tried to get in to get some narcotics (R.V, 278–79, 301). This use of the confession in argument is also to be considered in judging the effect of the confession and whether its admission could be held harmless error. Cf. *Chapman v. California,* 386 U.S. 18, 25, 87 S.Ct. 824, 17 L.Ed.2d 705.

After the prosecution rested the defendants presented no evidence on the issue of guilt or innocence of the kidnapping charge, and the jury returned a verdict of guilty against both defendants. Defendant Bond then did present evidence during the second stage of the trial when the former conviction was proved and his enhanced punishment of 15 years' imprisonment was fixed by the jury.

*The harmless error test*

■ Of course, the confession is a dramatic and impressive type of evidence. The issue is whether on the record as a whole we can declare a belief that the error in its admission here was harmless, beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; *Harrington v. California,* 395 U.S. 250, 251, 89 S.Ct. 1726, 23 L.Ed.2d 284; *Chase v. Crisp,* 523 F.2d 595, 598 (10th Cir.), cert. denied, 424 U.S. 947, 96 S.Ct. 1418, 47 L.Ed.2d 354. If there is not a reasonable possibility that the improperly admitted confession contributed to the conviction, reversal is not required. *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340. The conviction may stand only if we conclude that the minds of an average jury would not have found the State's case significantly less persuasive, had the confession been excluded. Ibid; *Chase v. Crisp,* supra at 600.

■ This record shows substantial testimony by Mrs. Keith on what happened in the empty apartment, the acts of defendants Jenkins and Bond, and of Wyatt, and identification of Jenkins and Bond. Substantial support for this came from observation by the officer of the room, the cords, the tools and the floor, and of Mrs. Keith rubbing her ankles. The proof was clear on the three leaving and the prompt apprehension in the Karmann Ghia of Jenkins and Bond, whom the officers identified in court. And Bond admitted being with Jenkins and Wyatt since the previous night. There was no contrary evidence offered by the defense, and the thrust of the defendants' arguments to the jury was that kidnapping, in the sense of confinement as required by the statute, was not shown (R.V, 293, 295–96; 285–86).

Thus, on the facts before the jury, the confession of Jenkins contributed no significant additional proof on the real question as to intent of secret confinement and guilt of kidnapping—the proven facts either were or weren't sufficient to find guilt. The way the case was proved and submitted, we are convinced that the minds of an average jury would not have found the case significantly less persuasive, had the co-defendant's confession been excluded and not ar-

gued. *Schneble,* supra, 405 U.S. at 432, 92 S.Ct. 1056; see *Brown v. United States,* 411 U.S. 223, 231, 93 S.Ct. 1565, 36 L.Ed.2d 208; *Milton v. Wainwright,* 407 U.S. 371, 377, 92 S.Ct. 2174, 33 L.Ed.2d 1; *Chase v. Crisp,* supra, 523 F.2d at 600. Accordingly, we agree with the district court's conclusion that the constitutional error was harmless, beyond a reasonable doubt.

*Second,* appellant Bond argues that he was improperly tried and convicted for kidnapping as it was so concurrent and incidental to other acts as to constitute an unnatural elevation of the crime charged.

Bond relies heavily on *Vandiver v. State,* 97 Okl.Cr. 217, 261 P.2d 617, in which evidence of the defendant having lifted and held a woman briefly after she refused a ride with him was held insufficient to prove assault with intent to kidnap and established only the lesser offense of assault. The proof in our case, however, was significantly different and the Oklahoma Court on the direct appeal held that it was sufficient to sustain the kidnapping conviction. *Jenkins v. State,* supra, at 508 P.2d at 662.

■ The interpretation of the State statute and its applicability to the facts were questions for the State Court and present no federal constitutional question for a habeas case. See *Hall v. Wainwright,* 493 F.2d 37, 39 (5th Cir.). Such a question on sufficiency of the evidence to sustain a state conviction generally raises no federal constitutional issue, *Sinclair v. Turner,* 447 F.2d 1158, 1161 (10th Cir.), cert. denied, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590, and this record is not entirely lacking in evidence to support the charge so as to demonstrate a denial of due process. See *Thompson v. City of Louisville,* 362 U.S. 199, 206, 80 S.Ct. 624, 4 L.Ed.2d 654.

*Third,* Bond argues that he was improperly denied an in camera evidentiary hearing

to determine whether his own purported confession and that of Jenkins were voluntary. More specifically, he points to the fact that the trial court was aware, at the time of his request for the hearing, that in his statement, related in the testimony of Officer Johnson, Bond had said that the men (Jenkins, Wyatt and Bond) had been together since the prior evening, they had been consuming a considerable quantity of alcoholic beverages, he (Bond) personally had consumed approximately a quart of whiskey during this time, and that he had become so intoxicated that during this time he could not remember exactly everything which he had done (R.V, 244).

■ We do not reach this question. While there was sufficient objection on the point in the State trial court to raise the issue (R.V, 242, 248–49), it is not shown to have been raised on the direct appeal or by state post-conviction proceedings,[5] as required for exhaustion of state remedies. See 28 U.S.C.A. § 2254(b) and (c); *Hoggatt v. Page,* 432 F.2d 41, 43 (10th Cir.). The burden of showing exhaustion of state remedies in accordance with the statute rests on the petitioner seeking federal habeas relief. *Baldwin v. Lewis,* 442 F.2d 29, 35 (7th Cir.). Moreover, the question was not presented to the district court in this federal habeas proceeding, as required for review by us. *Hoggatt v. Page,* supra at 42.[6]

■ *Fourth,* Bond says that the State court erred in overruling his motion for a severance. There is no showing, however, of any federal question affecting the validity of his conviction within the meaning of 28 U.S.C.A. § 2254. Without more, such claims of state procedural or trial errors do not present federal questions cognizable in a federal habeas corpus suit. *Pierce v. Page,* 362 F.2d 534, 535 (10th Cir.); *Wing v. Anderson,* 398 F.Supp. 197, 199 (E.D.Okl.).

---

5. Oklahoma does have a post-conviction procedure which was available at the time this federal habeas suit was brought. See 22 O.S.A. §§ 1080–88.

6. Bond argues that the district court considered this proposition on its own motion as being of particular concern. We do not so read the

cited portion of the district court's opinion (R.I, 89). The opinion refers to circumstances throwing doubt on the reliability of the statements of both Jenkins and Bond, but the court made no point of the lack of a state court hearing on the voluntariness or reliability of the statements.

**1378**

*Fifth,* Bond maintains that the State court erred in allowing prejudicial statements and in admitting evidence of violence, immaterial and unrelated to the elements of the crime as charged. More specifically he points to references to the shooting of James Keith and of Michael Wyatt, and similar occurrences.

Both the Oklahoma Court and this court generally admit proof which would show other crimes where it tends to prove guilt of the crime charged, or shows a common scheme or plan, motive or intent. See *Wright v. State,* 531 P.2d 696, 703 (Okl.Cr.); *Moran v. United States,* 404 F.2d 663, 667 (10th Cir.). The Oklahoma Court of Criminal Appeals on the direct appeal in this case did state that the frequency of such inflammatory remarks and the tone they imparted were of prejudicial quality. The Court said, however, that most of such evidence was clearly within the res gestae and in the circumstances the Court found that the complaints were not sufficient to cause a reversal. See 508 P.2d at 663. We feel that no denial of due process or other constitutional rights is shown.

We conclude that no constitutional infirmity in the State conviction is demonstrated and the judgment is

AFFIRMED.